IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| FACEBOOK ACCOUNTS: | ) | |
| | ) | |
| **WWW.FACEBOOK.COM/100005519471377** | ) | Magistrate No. |
| | ) | [UNDER SEAL] **18 . 449M** |
| | ) | |
| **WWW.FACEBOOK.COM/100025031654464** | ) | Magistrate No. |
| | ) | [UNDER SEAL] **18 450M** |
| | ) | |
| **FACEBOOK ACCOUNT ASSOCIATED** | ) | Magistrate No. |
| **WITH 724-761-1831** | ) | [UNDER SEAL] **18 . 451M** |

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANTS

### I. INTRODUCTION

I, Special Agent Michael Johns, being duly sworn, depose and state in support of an application for search warrants for stored communications, images, records, and other evidence and information in or pertaining to the following Facebook accounts ("the Accounts"):

* **www.facebook.com/100005519471377 (Damond GOGGINS Sr.)**

* **Facebook account associated with 724-761-1831**

* **www.facebook.com/100025031654464 (Tom McLaren)**

I am employed as a Special Agent with the Drug Enforcement Administration (DEA).  I have been so employed by the DEA since August 2002.  I am currently assigned to the Pittsburgh District Office, which is located in the Western District of Pennsylvania, and have been so assigned since March 2010.  Prior to my assignment at the Pittsburgh District Office, I was assigned to the Detroit Division Office, located in Detroit, Michigan.  I have completed 17 weeks of intensive narcotics training from the Drug Enforcement Administration's Justice Training Academy.  Prior to my employment, I spent three and a half years working as a Federal Police Officer for the United

States Capitol Police Department in Washington D.C., and was assigned to patrol and protection details.

I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses including those enumerated in Title 18, United States Code, Section 2516.

During my employment and tenure as a law enforcement officer, I have participated in numerous investigations of the unlawful possession and distribution of controlled substances, including cocaine, heroin, and marijuana, in violation of Title 21 of the United States Code. These investigations have involved the use of confidential sources. They have also involved physical surveillance, electronic surveillance, pen register and toll analysis, and Title III intercepted wire and electronic communications. I have been involved in narcotics related arrests and the execution of search warrants which resulted in the seizure of narcotics. I have supervised the activities of informants who provided information and assistance resulting in drug buys. Further, I have experience investigating financial crimes and money laundering, particularly as these investigations relate to narcotics crimes. I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, undercover techniques, white collar crimes, search warrant applications, Title III Investigation, and various other crimes.

I have reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations. I have had hundreds of conversations with drug traffickers and users as well as with other law enforcement officers about the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug

proceeds, and avoid getting caught by law enforcement officers. As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

I have participated in several investigations in which evidence was observed on, and/or obtained from, social media accounts, such as Facebook accounts. As a result of these investigations, I am aware that Facebook owns and operates a social-networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number and username to each account.

Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same groups or networks. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request". If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account typically

includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming events, such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can check in to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also typically includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

Facebook allows users to upload photos and videos. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. I believe that, for Facebook's purposes, the photos and videos associated with a user's account will typically

include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. I believe these chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and, although I do not believe Facebook records the calls themselves, I believe Facebook may keep records of the date of each call.

If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

Facebook accounts can have an activity log, which can be a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log can include stories and photos that the user has been tagged in as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log can be visible to the user but cannot be viewed by people who visit the user's Facebook page.

Facebook also retains Internet Protocol ("IP") logs for a given username or IP address. These logs may contain information about the actions taken by the username or IP address on

Facebook, including information about the type of action, the date and time of the action, and the username and IP address associated with the action.  IP addresses are assigned by internet service providers to their customers and are generally unique to a particular internet connection/customer at a particular moment in time.  Researching the assignment and use of a particular IP address at a particular moment in time can result in the identification of a specific internet user/internet connection.

Social-networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook can retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

Based on the foregoing, it is apparent that the computers/servers of Facebook are likely to contain any or all of the information referenced above for the Accounts that are the subject of this affidavit.

It should be noted that I have personally participated in the investigation detailed herein. In addition, I have reviewed information obtained through legal process, such as telephone records, telephone communications and associated data, and information obtained through law enforcement and commercial databases.  In addition, I have discussed this case with, and reviewed the reports of, other law enforcement officers who have been involved in this investigation.  I have

also reviewed information provided by informants. This affidavit is being submitted for the specific purpose stated herein. I have not, therefore, included every fact known to me concerning this investigation.

## II. **PROBABLE CAUSE**

### A. Background Information

I have participated in the investigation of the Darryl ARNOLD Drug Trafficking Organization (DTO), and its involvement in the trafficking of heroin. Based on the investigation to date, it is believed that the ARNOLD DTO is involved with the distribution of large quantities of heroin and fentanyl-laced heroin throughout the Washington, Westmoreland, and Allegheny Counties of Pennsylvania. The opiates sold by the ARNOLD DTO are believed to be the cause of numerous overdoses that have occurred in those areas since August 2015 and the heroin and fentanyl mixtures were obtained from at least one out-of-state source of supply.

Many of the primary members of the Organization's vertical supply chain, as well as of its distribution base, reside in the Monongahela Valley area south of Pittsburgh to include areas such as Monessen, Donora and Charleroi areas, to name but a few.

The investigation of the ARNOLD DTO included the controlled purchases of heroin, seizures of heroin and fentanyl, execution of search warrants, toll analysis, surveillance and confidential source debriefings, resulted in the identification of Damond GOGGINS, as a distributor of heroin in and around the Monessen and Donora areas of Southwestern Pennsylvania. Several arrests have been made during the course of the investigation and several members are still being investigated to date.

### B. Cooperating Source Information

During the beginning of March 2018 and on several occasions thereafter, investigators assigned to the DEA-Pittsburgh District Office spoke with confidential source referred to herein as "the CS". The interviews were not anonymous. The interviews mostly were telephonic due to the living and life situation of the CS, the interviewing agents were fully aware of the CS's identity, and the CS did not attempt to obscure his identity in any manner. The CS was made aware of the requirement that he provide only truthful information.

The CS has a criminal record – i.e., approximately 12 misdemeanor and felony arrests and convictions which include drug charges, false reports to law enforcement, robbery, possessing instrument of crime, simple assault and theft by unlawful taking. In the process of providing information to investigators during the last approximately twelve months, some of which is included below, the CS has knowingly incriminated himself as well as others. Such self-incrimination is supportive of the CS' credibility because it demonstrates that the CS is not merely attempting to incriminate others while exculpating himself.

No promises of compensation or non-prosecution have been made to the CS, although the CS is in process of being provided assistance with possible relocation benefits due to the circumstances described herein. The CS has been informed that investigators will attempt to protect him from harm. The threat of harm to the CS presented by Damond GOGGINS or the user of the Damond GOGGINS Facebook account, any user associated with a Facebook account linked to 724-761-1831, and user of the "Tom MCLAREN" Facebook account and others, as explained below, has made it difficult for the CS to consistently work to support himself and for the CS to find suitable housing.

It should also be noted that the CS was deactivated by DEA in late October 2017, when the CS was observed purchasing heroin from a member of the ARNOLD DTO in Monessen, PA.  The CS was contacted by investigators after the CS was observed and the CS voluntarily admitted to purchasing three glassine bricks of heroin with the stamp bag "NO LIMITS".

During the interviews referenced above, the CS provided the following information (as well as additional information that is not included herein):

In April 2017, Agents and Task Force Officers conducted an interview of a CS in regards to the drug trafficking activities of the ARNOLD DTO.  The CS stated he/she has known ARNOLD for several years and earned money by working in construction for ARNOLD, as well as distributing heroin supplied by ARNOLD or through a member of the ARNOLD DTO.  The CS stated the compensation for the work done was often times in the form of "bricks" (50 stamp bags) of heroin, in addition to cash.  The CS stated that ARNOLD would often joke and say that he had 150 "bricks" invested in a specific construction project which the CS completed for ARNOLD.  The CS stated that the going rate for work completed for ARNOLD would be one "brick" of heroin per day, in addition to cash.  The CS also stated that whenever ARNOLD was not present, the compensation was made by another member of the ARNOLD DTO.  In or about April 2017, the CS recalled being paid with one "brick" (50 Stamp bags) of heroin by another member of the DTO and that payment was at the direction of ARNOLD.

The CS detailed the upper tier of the ARNOLD DTO which is comprised of several individuals who are related to ARNOLD.  The CS knows that ARNOLD is in-charge and responsible for the upper tier members of his DTO being supplied with a constant flow of heroin; however, the CS stated that ARNOLD did not "touch the dope".  The CS estimated the ARNOLD DTO distributed at least 1,000 bricks (50,000 stamp bags) of heroin per week in the Monessen,

PA area and elsewhere. The estimate was based upon actual experiences and personal interactions the CS had with ARNOLD over several years as well as personal relationships with several members of the ARNOLD DTO. The CS identified several individuals as being upper tier members of the ARNOLD DTO and gave an account of how many "bricks" each member was responsible for on a weekly basis. One of the members of the ARNOLD DTO the CS discussed was Damond GOGGINS, a.k.a. "Quick", whom the CS stated was responsible for the distribution of at least 100 to 200 bricks of heroin per week.

In April 2017, the CS successfully purchased five "bricks" (250 stamp bags) of heroin from Damond GOGGINS for $900 in Official Advanced Funds. Prior to and after the controlled purchase, investigators searched the CS and CS's vehicle and no contraband was found. Investigators then instructed the CS to initiate contact with the known cellular telephone of GOGGINS. During the ensuing contact, a series of text messages were exchanged between the CS and GOGGINS, and they agreed to meet. The meeting occurred on a street located in Monongahela, PA. The CS was outfitted with a concealed recording device and met with GOGGINS between his vehicle and the CS vehicle, as observed by law enforcement. Shortly thereafter, the CS and GOGGINS were seen leaving the location at which time the controlling agents followed the CS to a predetermined location. Upon arrival at the predetermined location, the CS relinquished five "bricks" (250 stamp bags) of heroin to law enforcement. The suspected heroin was submitted to the laboratory and returned positive for approximately 5.1 grams of a heroin and fentanyl mixture.

During the morning hours of May 31, 2017, surveillance was established at the residence of Darryl ARNOLD – 171 Main Street, New Eagle, PA. Surveillance observed ARNOLD outside the rear of 171 Main Street, standing next to his 2015 Black Dodge Ram truck. Surveillance

additionally observed a Black Lincoln Navigator, commonly driven by PARRISH, parked next to ARNOLD's vehicle.  After a short time, surveillance observed 2014 Black Dodge Ram backed in blocking ARNOLD's vehicle in, at the rear of 171 Main Street.  Surveillance did not see ARNOLD or any individuals outside or in the vehicles.  The 2014 Dodge Ram that arrived was registered to 1st Choice Home Improvements and was driven by Tyler HOBERMAN.  HOBERMAN has been previously identified as a marijuana trafficker and in March 2017, plead guilty to felony state charges dealing in unlawful activities.

At approximately 10:20am, surveillance observed Damond GOGGINS arrive in his burgundy colored Infinity and park in the rear of 171 Main Street.  As detailed above, the CS has successfully conducted a controlled purchase of a heroin and fentanyl mixture from GOGGINS. At approximately 11:15am, HOBERMAN was observed leaving in his 2014 Dodge Ram and also was observed driving in a surveillance conscious manner by "squaring" the block prior to him leaving the area as if he was looking for the presence of law enforcement.  Surveillance was unable to be maintained on HOBERMAN.

At approximately 11:44am, surveillance observed ARNOLD and GOGGINS at the rear of 171 Main Street near the vehicles and also observed GOGGINS open the trunk of his burgundy Infinity.  Moments later, HOBERMAN arrived back at 171 Main Street and pulled in next to GOGGINS' burgundy Infinity.  GOGGINS opened the drivers' side door of his burgundy Infinity and began walking around while talking.  A few minutes later, GOGGINS walked towards the rear of his burgundy Infinity and placed a dark bag in the trunk.  GOGGINS then entered the driver's seat of the burgundy Infinity and left the area while surveillance was maintained on him. GOGGINS continued to drive out of New Eagle, PA and briefly stopped at the BP gas station on Main Street in New Eagle, and then continued out of town.  GOGGINS turned off Main Street and

11

began driving in a surveillance conscious manner by squaring the block. Surveillance was lost for a few moments due to GOGGINS driving and was re-established quickly.

At approximately 12:22 pm, GOGGINS was the subject of a traffic stop by the Washington County Sherriff's Department. The deputy had been in contact with members of the federal investigation into GOGGINS and ARNOLD, who had observed the above transaction, and who knew GOGGINS to have a suspended license. As a result of GOGGINS' driving with a suspended license, the deputy initiated a traffic stop. Upon approaching the vehicle, officers confirmed the driver was GOGGINS, and proceeded to confirm that his license was suspended. GOGGINS consented to a search of his vehicle, and deputies located approximately 10 pounds of marijuana, inside 9 individually vacuum sealed bags, all inside of a larger trash bag. In addition, officers located a small note pad containing what appeared to be "owe sheets" – listing dates, monetary amounts, and initials.

During the stop, GOGGINS was observed on his cell phone, and investigators identified a Facebook post, posted by GOGGINS on May 31, 2017, at approximately 12:20 pm that read "Wow jus got set up real smooth can't b mad saw it coming." A screen shot of this Facebook post was made by investigators. Investigators believe when GOGGINS stated "jus got set up real smooth" he was expressing his belief that someone had informed police that he had a large amount of marijuana in his vehicle. Due to the timing of the stop, the contents of GOGGINS Facebook posts and the visual observations of investigators, it was determined that GOGGINS was the user of the account listed as Damond Goggins Sr. (www.facebook.com/100005519471377).

GOGGINS was arrested on May 31, 2017 and remained in Washington County Jail until July 13, 2017 when he was transferred to the custody of the United States Marshal Service. On July 19, 2017, GOGGINS was released from custody of the United States Marshal Service and on

August 3, 2017, GOGGINS self-surrendered to the United States Marshal Service to serve 18 months of incarceration. Investigators have verified to date that GOGGINS has in fact been incarcerated in federal custody since August 3, 2017, and remains there to date.

### MESSAGES ASSOCIATED WITH WWW.FACEBOOK.COM/100005519471377 (DAMOND GOGGINS SR.)

On March 10, 2018, at 8:50am, the CS received a Facebook message from the account of Damond GOGGINS Sr. which stated "Smfh did me like that" (shake my fucking head did me like that-an allegation that the CS had cooperated against GOGGINS). The CS replied to the account asking "Like what? What are u talking about bro". On March 11, 2018 at 12:44pm, the account of GOGGINS replied "I hope I'm wrong". The CS asked on March 13, 2018 at 2:53pm "Hope ur wrong bout what bro just tell me." Since the last communication, there have not been any additional communications from the Facebook account of GOGGINS. The CS did make a controlled purchase of a heroin and fentanyl mixture from GOGGINS as previously mentioned, but did not participate in marijuana arrest that GOGGINS was arrested for. Investigators believe the user of GOGGINS Facebook account is attempting to intimidate the CS with the open ended and implying statements made on the account as scare tactics toward the CS and also trying to get the CS to admit to the CS's cooperation with law enforcement.

### MESSAGES ASSOCIATED WITH PHONE NUMBER 724-761-1831

On March 18, 2017, The CS received a text message from an unidentified person using 724-761-1831 in an accusatory and threatening nature. A subpoena was sent out for tolls and subscriber information and investigators are waiting for a response from the provider at this time. The CS does not know who uses 724-761-1831 and does not recall ever having communication with the phone number.

The CS received a text message on March 18, 2018 at 1:36pm from 724-761-1831 asking "Why ur bitch ass not show fucker" and another message at 1:41pm stating "2 bzy suckin dickz little prick." The CS replied to the messages at 3:40pm asking who it was texting and followed it up with attempting to call the number with no answer.

The user of 724-761-1831 replied with a text message asking "Who dis callin?" and "U txt me why u askin". The CS replied without disclosing the CS's identity and the unknown user of 724-761-1831 replied "U got da number u know who dis is why rite my name let u do more rattin then u already did bitch" and followed up with "Where u at ill come now."

The CS and unknown user of 724-761-1831 exchanged messages with the user of 724-761-1831 stating and asking "Fuck off u said I got u mixed up im guna make sure now. I said whr u at ill come now". Investigators are uncertain if this is a random occurrence with someone texting the wrong number or if this individual is in fact associated with members of the ARNOLD DTO in an attempt to flush out the CS in the investigation and intimidate and threaten that individual, but all leads must be exploited for the safety of the CS and the integrity of the investigation.

## MESSAGES ASSOCIATED WITH WWW.FACEBOOK.COM/100025031654464 (TOM MCLAREN)

On April 4, 2018, the CS received a Facebook message from an individual who identifies on Facebook as "Tom McLaren" (www.facebook.com/100025031654464). The Facebook account used by "Tom McLaren" identifies as studied at: School of hard knocks, went to: Detroit Academy of Martial Arts, lives in: Monessen, Pennsylvania and from: Detroit, Michigan. Investigators have made attempts to identify the user of this account from looking at the publically available information to include photos of the account and have not been able to identify the user. Investigators have additionally contacted the Monessen Police Department in reference to the address of 606 Park Manor Drive, which is the address given in the Facebook message directed to

14

the CS, and were unable to identify an individual at or near that location who matches the description whom they are aware of.

On April 4, 2018, the CS received the Facebook message from the account of "Tom McLaren" which reads: "Maybe u shouldn't rat people ya am out bitch they couldn't keep me in jail for life my address is 606 park manor drive Monessen pa motherfucker am find u and kill u." The CS replied "I don't even know u what are u talkin".

The CS does not know the user of this account and also looked at the pictures associated with the account and does not recognize this individual. There have been no more messages since the original posting and reply on April 4, 2018. Investigators have been unable to identify the user of this account to date.

### III. CONCLUSION

Based on the foregoing, there is probable cause to conclude the accounts identified above contain the items listed in Attachment A to the Search Warrants and evidence of criminal activity, including violations of 21 U.S.C. §§ 841, 843, and 846 (distributing and conspiring to distribute a controlled substance and using a communication facility in furtherance thereof), 18 U.S.C. § 1513 (Retaliating Against Witness), and 18 U.S.C. § 1512 (Tampering with a Witness). The accounts are likely to contain incoming or outgoing communications of Damond GOGGINS or the user of the Damond GOGGINS Facebook account, any user associated with a Facebook account linked to 724-761-1831, and user of the "Tom MCLAREN" Facebook account targeting the CS with threatening directed communications that the CS is a "rat" (referring to cooperation with law enforcement) and "will find u and kill u". Moreover, the accounts are also likely to contain attribution evidence, including images as well as communications, linking Damond GOGGINS or the user of the Damond GOGGINS or the user of the Damond GOGGINS Facebook account, any

user associated with a Facebook account linked to 724-761-1831, and user of the "Tom MCLAREN" Facebook account to the accounts as well as to each other and to other co-conspirators throughout the investigation.  Such attribution evidence will not only assist in authenticating the accounts but also in linking Damond GOGGINS or the user of the Damond GOGGINS Facebook account, any user associated with a Facebook account linked to 724-761-1831, and user of the "Tom MCLAREN" Facebook account to the conspiracy.  While perhaps counter-intuitive, I am aware that drug traffickers occasionally post trophy images showing their drugs and/or firearms and "bling" images showing their proceeds and/or assets on their social media accounts or save them on their cell phones.

It should be emphasized that non-disclosure by Facebook at this time of the search warrants, as well as of the corresponding 18 U.S.C. § 2703(f) preservation request letter that will be sent to Facebook contemporaneous with the search warrants, is vital so that none of the users of the accounts or people personally associated with them are notified of the existence of the investigation and the CS's cooperation.  Disclosure at this time could very well cause an adverse result, such as retaliation against the CS as well as against others with whom the CS has resided. Disclosure at this time could also very well cause the deletion or destruction of evidence, particularly electronic evidence in the accounts, as well as on cell phones possessed by Damond GOGGINS or the user of the Damond GOGGINS Facebook account, any user associated with a Facebook account linked to 724-761-1831, and user of the "Tom MCLAREN" Facebook account to the conspiracy, and their associates.

I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the

16

content of communications) particularly described in Section I of Attachment B.  Upon receipt of

the information described in Section I of Attachment B, government-authorized persons will

review that information to locate the items described in Section II of Attachment B.

Based on the forgoing, I request that the Court issue the proposed search warrant.

This Court has jurisdiction to issue the requested warrant because it is "a court of competent

jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required

for the service or execution of this warrant.

MICHAEL JOHNS
Special Agent
Drug Enforcement Administration
(DEA)


Sworn to and signed before me
this  11  day of April 2018.


ROBERT C. MITCHELL
United States Magistrate Judge

17

**ATTACHMENT A**
**DESCRIPTION OF PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the Facebook user ID Numbers: **100005519471377, 100025031654464 and Facebook account associated with phone number 724-761-1831** that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

**I.**     **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)      All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)      All "check ins" and other location information;

(g)      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(h)      All information about the Facebook pages that the account is or was a "fan" of;

(i)      All past and present lists of friends created by the account;

(j)      All records of Facebook searches performed by the account;

(k)      All information about the user's access and use of Facebook Marketplace;

(l)      The types of service utilized by the user;

(m)      The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(n)      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(o)      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. § 1513, 18 U.S.C. § 1512 (related to Retaliation and Tampering with Witness), 18 U.S.C. § 922(g)(1)(related to illegal firearms), and Title 21 U.S.C. § 841(a)(1) and (b)(1)(C)(related to possession with intent to distribute controlled

substances), since April 1, 2017, including, for each user ID identified on Attachment A, information pertaining to the following matters: veiled or direct threats, the distribution of illegal drugs, and acquisition of a firearm.

Records relating to who created, used, or communicated with the user ID, including records about their identities and whereabouts.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)**

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by Facebook, and my official title is _____.  I am a custodian of records for Facebook.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Facebook, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Facebook; and

c.      such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____          _____
Date                                                      Signature